## Thomas, Field & Company et al. v. Engle et al.

(Decided April 22, 1930.)

WILSON & WILSON for appellants.

C. W. NAPIER and NAPIER& EBLEN for appellees.

Opinion of the Court by Commissioner Stanley—
Reversing.

The appellants, who are wholesale merchants, with judgments against appellees, A. J. Engle and C. J. Engle, formerly partners doing business as Engle Brothers, are seeking by this suit to set aside conveyances of property made by A. J. Engle to his father and mother, the appellees, Albert and Rachel Engle. It is charged that the conveyances were made without consideration at a time when the grantor was known by the grantees to be insolvent, and for the fraudulent purpose and intent to hinder, cheat, and defeat the creditors in the collection of their respective demands. There are two deeds involved, one conveying a certain 100 acres of land and the other an undivided one-half interest in a storehouse in the village of Duane, Perry county. The lower court gave judgment for the defendants, which the plaintiffs insist is erroneous.

We summarize the evidence and conclusions submitted as proving that the conveyances were fraudulent. For some time Engle Brothers had conducted a general store in the building at Duane, and in 1926 several judgments were recovered against them by wholesale merchants. At least one of the executions had been replevied with the appellee Albert Engle as surety on the bond. Early in November, 1926, executions were levied on the stock of merchandise at Duane and also upon a small quantity of goods which had been recently moved over the mountain about five miles to the home of their father and mother on Troublesome creek. It appears the goods in the storehouse were sold to satisfy executions of others than the appellants, but that which had been moved was sold by the sheriff on November 18th for the benefit of these parties, and purchased by the father for $56. On Monday following, the 22d, the two deeds, each bearing date of July 29, 1925, were put to record in the county court clerk's office.

The deeds undertook to convey all the property owned by the grantor, who, himself, wrote and dated

them. It appears that his brother and partner owned no property. It is pretty well established that the storehouse was at the time of the alleged deed worth from $2,500 to $3,500, while the recited consideration was only $300. The land was probably worth $1,500, and the consideration given for it was $250. The property had remained in the possession of Engle Brothers and the grantor all the time since the purported date of the deeds, except for a period when the storehouse was leased to another, during which time A. J. Engle collected the rents therefor. He also listed and paid taxes on both pieces of property. A year after it is claimed the property was conveyed by him, A. J. Engle executed a mortgage on it to a bank to secure his indebtedness of $600.

When examined as to the time and circumstances of the execution of these deeds, the defendants evaded and equivocated, ducked and dodged. The deputy county court clerk, their kinsman and neighbor who took the acknowledgments, in giving his testimony, bandied and badgered, fumbled and forgot. He says the acknowledgments were taken in the father's home on the date of his certificate. He first said that it was cold weather, then that it was warm and the crops were growing, then he just didn't remember about the weather, but finally recalled that there was on that occasion a little stock of merchandise at the old gentleman's home. This, it was established, had been placed there during November, 1926, the 22d of which month the deeds bearing the date of July 29, 1925, were recorded.

For the defendants, it is testified that the father owned the lots in 1920. He and his two sons and son-in-law, Charles Jaber, built the storehouse with the lumber sawed on the father's place. During the course of its construction, a deed was made by the father to A. J. Engle and his son-in-law, Jaber, for the recited consideration of $700 cash. It is said, however, that only Jaber actually paid his part of the purchase price, and that it was agreed by A. J. Engle and his father that if he made good in business he would pay his share, but, if he did not, then that he would reconvey it to the father and should be paid for his labor and $250 which he had paid for doors, windows, etc. It does not appear how the other son, C. J. Engle, was compensated for his labor. The father stated, when giving his deposition as on cross-examination, that the building cost him originally about

$350. When giving his deposition on direct examination, he calculated the building had cost him $1,500 or $2,000. Since the deeds in controversy had been made to him in July, 1925, he had expended over $1,000 on additional improvements.

He further testified that he had advanced to his sons over $1,200, and had paid $309 on a replevin bond. His testimony is confusing as to whether these sums were paid before or after the deeds were made, at which time he had paid the son $550 in money. His son says that the father had advanced $630 to his firm in May or June, and about $350 afterwards, and had also paid $500 to his son Charles J. Engle. It appears, therefore, that, notwithstanding the agreement to reconvey the storehouse property upon the failure to pay the consideration, and the fact that the son was indebted to the father for a considerable sum for advancements made, the father paid him $550. Before closing the case, Albert Engle gave an additional deposition in which he filed notes claimed to have been given by his sons, one for $200 dated August 7, 1924, one for $630 dated June 7, 1926, and a note which he had given a bank on February 12, 1927, for $308.92 on account of his son. The $630 note was written on a page in the middle of an account book, and its validity is questioned by evidence that the ink was fresh and showed it to have been written quite recently.

The explanation of the mortgage given in July, 1926, by A. J. Engle to the bank, is that he was mortgaging his expectancy from his father's estate when he shall have died, or perhaps when he should receive the property back as a gift from his father.

It will thus be seen that the case is plastered with familiar badges of fraud which are but feebly, if at all, explained as legitimate transactions. The evidence clearly establishes the right of the plaintiffs to have the deeds set aside under the frauduelnt conveyance statutes.

The lower court erred, and the case is reversed, with directions to enter a judgment in conformity with the expressions of this opinion.